**UNITED STATES of America,**

v.

**Clement BAILEY, a/k/a/ Clem Bailey, Jewelene Bailey, Kristi Shelton, and Kathy Zeeb, all d/b/a Clem Bailey & Associates.**

Civ. A. No. 91–058–Y.

United States District Court,
N.D. Texas,
Fort Worth Division.

April 9, 1992.

Noreene C. Stehlik, John D. Russell, U.S. Dept. of Justice, Office of Sp. Litigation, Tax Div., Washington, D.C., for plaintiff.

Jack M. Price, Law Office of Jack M. Price, Austin, Tex., for defendants.

## OPINION AND ORDER

MEANS, District Judge.

This case is before the Court on the complaint of the United States of America, which seeks to permanently enjoin Clement ("Clem") Bailey, Jewelene Bailey, Kristi Shelton, and Kathy Zeeb, individually, and doing business as Clem Bailey & Associates, from preparing federal income tax returns for compensation.

The Court held a preliminary injunction hearing in the spring of 1991, during which the United States elicited testimony from twenty-two witnesses. The Court then entered an agreed order in June which enjoined the defendants from preparing tax returns for any individuals who were not already their clients and from interfering with the proper administration of the internal revenue laws. The defendants were also ordered to abide by all Internal Revenue Service rules applicable to tax return preparers. At trial on the merits in January 1992, the United States offered testimony from forty-six witnesses and entered 890 exhibits into evidence. After reviewing the testimonial and documentary evidence adduced at trial, this Court has made findings of fact as to each taxpayer whose return was entered into evidence. Pursuant to those findings, this Court will grant the government's petition for injunctive relief in full as to Clem and Jewelene Bailey and in part as to Kristi Shelton and Kathy Zeeb.

## I. FINDINGS OF FACT

Clem Bailey & Associates (hereinafter, "CBA"), now defunct, prepared federal income tax returns, both corporate and individual. CBA employed Clem Bailey, his

wife, Jewelene Bailey, Jewelene Bailey's two daughters, Kristi Shelton and Kathy Zeeb, and a number of bookkeepers, typists, and clerical personnel. The Baileys, Shelton, and Zeeb are income tax return preparers as that term is defined in 26 U.S.C. § 7701(a)(36).[1]

CBA, which obtains its clients by word-of-mouth advertising, prepared 7320 federal income tax returns from 1988 through 1990. In 1991, CBA prepared a total of 1764 returns. Of those, Clem Bailey prepared 624; Jewelene Bailey, 273; Kristi Shelton, 548; and Kathy Zeeb 319. These returns were filed in twenty-one different districts covering the southwestern United States.

When a client came into CBA's office, customarily one or more of the defendants met with the client for thirty minutes to an hour and prepared a handwritten return based upon the information provided by the taxpayer. The return was then sent to a typist for final preparation and proofread by either the typist or another clerical worker who then signed the preparing defendant's name to the return. None of the defendants reviewed the return again before the taxpayer actually filed it with the Internal Revenue Service ("IRS").

As part of its "Clem Bailey Return Preparer Project," the IRS spent almost 15,000 hours examining 521 individual and corporate returns prepared by CBA. Over eighty percent of them contained an understatement of tax liability. Cumulatively, those understatements exceeded two-and-one-half million dollars. Clem Bailey prepared 340 of those returns; Jewelene Bailey, forty; Kristi Shelton, sixty-nine; Kathy Zeeb, sixty; and Clem Bailey & Associates prepared twelve.[2]

Clem Bailey has been preparing federal income tax returns since 1951. In 1957, he and his wife established Clem Bailey & Associates, but on December 31, 1990, they dissolved the enterprise and became self-employed tax preparers. Bailey does not have a college degree, nor is he a certified public accountant or an enrolled agent allowed to practice before the Internal Revenue Service.

Jewelene Bailey has been preparing federal income tax returns since 1957. She does not have a college degree, nor is she a certified public accountant or an enrolled agent allowed to practice before the IRS. Jewelene is currently in business with her husband, who often assists her in preparing returns.

Kristi Shelton has been preparing federal income tax returns since 1981 when CBA first employed her. Her professional education consists of "on the job" training by Clem Bailey and attending seminars on relevant tax topics. She does not have a college degree, nor is she a certified public accountant or an enrolled agent allowed to practice before the IRS. Since December 1990, Shelton has been a self-employed income tax preparer, but she shares office space with Clem and Jewelene Bailey.

Kathy Zeeb has been preparing federal returns since the late 1970s. She attended one year of college at Texas Tech. She also attended a college in Oregon where she was subsequently licensed to prepare tax returns. Zeeb does not have a degree in accounting, nor is she a certified public accountant or an enrolled agent allowed to practice before the IRS. From 1982 through 1990, Zeeb worked for CBA but since the end of December 1990, Zeeb has been self-employed in the tax preparation business. Like Shelton, Zeeb shares office space with the Baileys.

---

**1.** Section 7701(a)(36) of the Internal Revenue Code defines an "income tax return preparer" as:

any person who prepares for compensation, or who employs one or more persons to prepare for compensation, any return of tax imposed by subtitle A or any claim for refund of tax imposed by subtitle A. For purposes of the preceding sentence, the preparation of a substantial portion of a return or claim for refund shall be treated as if it were the preparation of such return or claim for refund. 26 U.S.C. § 7701(a)(36) (1990).

**2.** The IRS attributed twelve unfiled returns to the firm because the defendants willfully failed to prepare the returns—despite having received the necessary information from the taxpayers and having been paid to prepare the returns.

The Court makes the following findings of fact as to the conduct of each of the defendants in preparing federal income tax returns for the taxpayers whose names are set out below:

## A. CLEM BAILEY

### 1. DONNIE BARROW

Donnie Barrow is the lead musician in a band that plays regularly at the Stagecoach, a nightclub in the Fort Worth area. The Stagecoach pays the band members directly, and issues a Form 1099 to each member.[3] Donnie Barrow has a ninth-grade education and, because he is not sophisticated in tax matters, he hired Clem Bailey to prepare his federal income tax returns from the 1970s through 1987. Bailey also prepared the individual tax returns of at least one other Stagecoach band member.

Barrow met with Bailey for twenty to twenty-five minutes to prepare his 1987 return. He gave Bailey his financial records and bank statements, including the Form 1099 he received from the Stagecoach, but did not give Bailey any cancelled checks, bank statements, or a Form 1099 showing that he had compensated other band members. The 1987 return Bailey prepared reports Barrow's income of $28,000 from the Stagecoach on Schedule C of Form 1040.[4] Line 10 of Barrow's Schedule C shows a deduction of $10,375 for payments to other band members, ostensibly for substituting for him when he was ill. Barrow testified, however, that he never paid the other band members or anyone else to substitute for him when he could not play. He did not tell Bailey that he made such payments, nor did Bailey ask him whether he had.

Bailey appeared with Barrow when the IRS examined his 1987 return. When the examining agent questioned Barrow about the payments, Bailey told Barrow that they were payments to the other band members. Barrow denied making such payments, however, so Bailey told Barrow to tell the IRS that the commissions were "a misunderstanding." The IRS disallowed the commission expense, and Barrow agreed that he owed the additional tax. Although the 1987 return showed that Barrow was entitled to an earned income credit of $851, Barrow actually owed $6,503.41 in additional taxes.

In his affidavit filed with the IRS, Bailey swore that Barrow told him he had paid the other band members and that Bailey accepted Barrow's oral representation without making personal verification. Bailey further stated that IRS regulations permitted him to rely in good faith on the information allegedly furnished by Donnie Barrow. Bailey is greatly in error. The revenue rulings specifically require a tax preparer to "make reasonable inquiries" if the information is incorrect or incomplete or if a code section or regulation requires the existence of specific facts, circumstances, or documents as a condition to claiming a deduction. *See* Rev.Proc. 80–40, 1980–2 C.B. 774.

Clem Bailey knew or should have known that Barrow did not pay other members of the band. He prepared the individual tax returns of at least one other band member and knew that the Stagecoach paid the band members directly. Further, he knew Barrow's annual earned income was insufficient for him to pay over $10,000 to other musicians for performing in his absence. Finally, even if Barrow did tell Bailey he paid his substitutes himself, Bailey had an obligation as a return preparer to require documentary proof of payment, whether in the form of cancelled checks, receipts, or Forms 1099 issued by Barrow. Clem Bailey knowingly and intentionally understated Barrow's 1987 tax liability by including a fraudulent deduction on Barrow's return.

---

3. Persons who, in the course of their trade or business, make payments of $600 or more to any one person for rent, salaries, wages, or other income, are required to report the payment on a Form 1099 to the IRS. *See* 26 U.S.C. § 6041 (1986).

4. Individuals who own an unincorporated business report their income and expenses on Schedule C of Form 1040. The taxpayer then reports the net profit or loss from the Schedule C on the face of his Form 1040.

## 2. JOSEPH BOWLES

Joseph Bowles works for General Dynamics and runs a farm he inherited from his father in 1988. Clem Bailey prepared Bowles's federal income tax returns in 1987, 1988, and 1989.

On Bowles's 1988 return, Bailey prepared a Form 4562, a depreciation form, which valued the farm equipment Bowles inherited from his father at $61,153. Bailey obtained this information from the inventory furnished to the probate court which set out the value of each piece of equipment. Bowles testified that he merely gave the inventory to Bailey; they did not go over the individual items on it, nor did Bailey ask him any questions about it.

The inventory lists a front-end loader at $1500. A list attached to Bowles's 1988 return, however, valued the front-end loader at $15,000. Bowles testified that he did not add the extra zero to the value of the loader, and that he first saw the changed valuation at the audit. Bailey testified that Bowles orally told him that he acquired additional farm equipment worth about $13,500 which is not shown on the list. Bailey testified that because $13,500 and $1500 add up to $15,000, he merely added the extra zero to the $1500 Bowles originally listed to reflect the additional equipment.

Bailey admits, however, that he added *other* items to the list and valued *them* separately, so it is inconsistent that he would lump $13,500 worth of equipment with the $1500 front-end loader rather than list that equipment separately as well. Neither Bowles nor Bailey can provide documentation to support a depreciation deduction for the additional $13,500. This Court believes that Clem Bailey provided a falsified document to the IRS in order to justify his intentional overstatement of Bowles's front-end loader and additional farm equipment. In light of this evidence, this Court finds that Clem Bailey knowingly and intentionally understated Bowles's 1988 tax liability.

## 3. DANNY and GLENDA BUTLER

Danny Butler is a self-employed construction contractor. Clem Bailey prepared Butler's federal income tax returns from the mid–1970s until 1988. During the fall of 1987, Bailey promised Butler that he would incorporate Butler's construction business as "Danny Butler Enterprises." Butler then provided all the necessary information and paid Bailey to prepare the corporate returns for 1987, 1988, and 1989.

Both Butler and his wife, Glenda, asked Bailey numerous times about the status of their 1987 corporate return. When Bailey told them that the return would not be ready to file by the December 15, 1988 deadline, they secured an extension of time to file until May 1989. Bailey subsequently told Glenda Butler to request another extension, which he said would be a granted since the Butlers did not owe any taxes. After the Butlers received an IRS notice in late summer 1989 that they were being audited, Glenda called Bailey's office "probably fifteen or twenty times" in an attempt to obtain the return. No one ever returned her calls.

Although Bailey represented to the examining IRS agent in Glenda Butler's presence that he had prepared the corporate return, neither of the Butlers ever saw it. No other conclusion is possible except that Clem Bailey failed to prepare a corporate tax return for Danny Butler Enterprises in 1987 despite having timely received the necessary information and having been paid to prepare it. As a result of Bailey's failure, the IRS attributed $389,400 in 1987 income earned by Danny Butler in his construction business to the Butlers individually. Bailey, who did prepare the 1987 individual return for the Butlers, failed to report this income on that return. Accordingly, this Court finds that Clem Bailey knowingly and intentionally understated the Butlers' tax liability by failing to report the 1987 income earned by Danny Butler's construction business on either the Butlers' corporate or individual returns.

## 4. HAROLD and BONNIE CHANCELLOR

Harold "Snuffy" Chancellor is a self-employed professional rodeo clown. Bonnie Chancellor helps her husband in his busi-

ness by setting up appointments, answering the telephone, handling his itinerary, and keeping the financial records. She does not receive a salary for her assistance.

Clem Bailey prepared the Chancellors' federal income tax returns from 1983 though 1988. Chancellor customarily gave Bailey a summary sheet of his expenses for the year to assist him in preparing his return. Schedule C attached to the Chancellors' 1987 Form 1040 shows a deduction of $9,000 for wages to a spouse. The summary sheet prepared by Chancellor, however, does not reflect a salary expense for his wife, and Chancellor did not tell Bailey that he paid his wife or anyone else a salary. Nevertheless, Bailey told Chancellor that he was entitled to deduct a salary for his wife because she assisted him in his rodeo business. Thus, Clem Bailey created a false deduction for wages to a spouse on the Chancellors' 1987 return.

Clem Bailey also told the Chancellors, contrary to law, that if they went out to dinner, they could deduct the cost of the meal as a "quiet business meal" provided they talked about Snuffy's rodeo clown business during dinner. Although Chancellor's summary sheet does not contain an entry for "quiet business meals," Bailey included such a deduction on the Chancellors' 1987 return. Not surprisingly, the IRS disallowed this expense. Clem Bailey knowingly and intentionally understated the Chancellors' tax liability by including fraudulent deductions on their 1987 return.

## 5. CHARLIE and VICKI CRISP

Charlie Crisp owns A & C Fire Protection, a business which installs fire-fighting equipment. Jewelene and Clem Bailey prepared individual and corporate federal income tax returns for Crisp and A & C Fire Protection from 1980 through 1988.

For the preparation of the 1988 corporate return, Crisp gave the Baileys a sheet of lined yellow paper which summarizes that year's business expenses for A & C Fire Protection. The summary sheet shows two entries for labor costs, one for $184,188.09,

and another for $7350. Also, a handwritten scrawl near the bottom of the page states, "$85,000 transferred by note to Fire Sprinkler." Although Crisp did not make the $7350 entry for labor costs or scrawl the notation at the bottom of the summary sheet, those figures appeared on the summary sheet when Crisp received it back from Bailey's office.

The 1988 corporate return for A & C claims $276,538.09 in labor costs. Bailey apparently arrived at that number by adding to the entry of $184,188.09 for labor costs shown on the summary sheet the two unexplained entries for $7350 and $85,000. Bailey testified that the labor costs exceeding $184,188.09 were those owed by Crisp's company to a similar company owned by his brother. Crisp, however, denied that he owed any labor costs to his brother's company. This Court finds that Clem Bailey understated the tax liability of A & C Fire Protection by intentionally and knowingly overstating labor costs on its 1988 return.

## 6. EARL CROMEANS and EARL CROMEANS DOZER, INC.

Earl Cromeans owns an incorporated earthmoving equipment business, Earl Cromeans Dozer, Inc. He hired Clem Bailey to prepare his personal and corporate tax returns for most of the 1980s because he considers himself unsophisticated in tax matters. His trust in Bailey was such that he never reviewed the prepared returns; he merely signed on the appropriate lines before sending them to the IRS.

In 1987, Earl Cromeans sold $57,500 worth of equipment: a backhoe for $7500; a bulldozer, truck, and trailer for $20,000; and a loader, maintainer, and two dump trucks for $30,000 in three cash installments of $15,000, $5000, and $10,000. Cromeans consulted with Bailey twice prior to the sales to ensure that his profit would not be consumed by taxes. Despite Bailey's knowledge that the sales totalled $57,-500, Form 4797 of the 1987 corporate return shows equipment sales of only $42,-

500.[5] Bailey testified that Cromeans failed to tell him about the cash income received from the equipment sales. Bailey is not credible, however, especially in view of the fact that Cromeans did inform the IRS examiner about the amount of cash he received from the equipment sales. Clem Bailey knowingly and intentionally understated Earl Cromeans's corporate income tax liability by omitting $15,000 in cash income from equipment sales on his 1987 corporate return.

Cromeans and his wife are the only officers of Earl Cromeans Dozer, Inc. The corporation does not pay them a salary, and Cromeans testified that he never told Bailey that it did. Nevertheless, the 1987 corporate return for Earl Cromeans Dozer, Inc. reflects a deduction of $20,000 for compensation of officers. Bailey testified that Earl Cromeans told him that the $20,-000 represented an income bonus. Bailey, however, failed to report the "income bonus" on Cromeans's individual return and did not appear at the audit to substantiate the figures reported on the corporate return. This Court finds that Clem Bailey knowingly and intentionally understated the corporation's income tax liability by including on its 1987 return a false deduction for compensation paid to officers.

### 7. WANDA FANNIN

Wanda Fannin, the owner of Wanda Fannin, Inc., a ladies' clothing store in Waco, Texas, hired Clem Bailey to prepare her individual and corporate federal income tax returns during the 1980s. Fannin hired a separate accounting firm in Waco to prepare all other returns, forms and financial statements. At the end of each tax year, Fannin gave the financial statements to Clem Bailey, Kristi Shelton, or Kathy Zeeb to use in preparing her income tax returns.

On the 1988 corporate return for Wanda Fannin, Inc., Bailey increased the cost of goods sold by over $49,000 from the amount shown on the financial statements, causing a reduction in the corporation's

taxable income by the same amount. Bailey also increased the entry for loans from stockholders to the corporation by a corresponding amount, as reported on Schedule L. There is no evidence that anyone connected with Wanda Fannin, Inc. told Bailey that the entries for cost of goods sold and loans from shareholders should be increased. No other finding is possible but that Clem Bailey knowingly and intentionally understated Wanda Fannin, Inc.'s tax liability by fabricating an increase in cost of goods sold and loans from shareholders on its 1988 return.

### 8. FRANK and ROSALIE LANDIS

Frank Landis took early retirement from Union Pacific Railroad in December 1987 in consideration of which the railroad paid him $30,000 ("railroad severance pay"). Mr. Landis and his wife, Rosalie, originally employed H & R Block to prepare their 1987 federal income tax return. H & R Block included the railroad severance pay as taxable income on the Landises' return. After hearing from other railroad retirees that the severance pay might not be taxable, the Landises filed an amended return which deleted the $30,000 payment and claimed a substantial refund. The Internal Revenue Service subsequently disallowed the refund.

The Landises later heard from other railroad retirees that Bailey could obtain a refund of the tax paid on the railroad severance pay. Clem Bailey confirmed to them that for a fee of $500 he could obtain such a refund. In January 1989, he prepared an amended return showing that the railroad severance pay qualified for ten-year averaging because it constituted part of a qualified pension, stock sharing, or bonus plan. Consequently, the Landises received a refund of $6661 in February 1989.

The IRS subsequently selected the Landises' 1987 return for examination. At the audit, which Bailey failed to attend despite a request from Landis that he do so, the

---

**5.** Gains or losses from the sale of capital items used in a trade or business are reported on a

Form 4797 and filed with the taxpayer's return.

IRS determined that the entire amount of the railroad severance pay was taxable.

The courts have consistently held that railroad severance pay is taxable income. *See Martin v. Commissioner of Internal Revenue*, 877 F.2d 449, 451–53 (6th Cir. 1989); *Sutherland v. Egger*, 865 F.2d 56, 58 (3rd Cir.1989); *Herbert v. United States*, 850 F.2d 32, 33–36 (2nd Cir.1988). The law was settled on this matter at the time Bailey prepared the Landises' amended return in 1989. Bailey's position that railroad severance pay is not taxable is unreasonable and not supported by the internal revenue laws. Bailey's preparation of a second claim for refund, knowing that the IRS had already rejected a virtually identical claim, constitutes a willful understatement of the Landises' 1987 tax liability.

### 9. WENDELL LAYNE

Clem Bailey prepared Wendell Layne's federal income tax returns in 1986 and 1987. Layne was self-employed at Barker Cable TV during 1987, and he paid himself $56,700 during that year. Layne's 1987 return showed no income taxes due because his income was offset by a large net operating loss carryforward. Since Layne's debts had been discharged in bankruptcy in 1986, however, he had no net operating loss to carry forward. *See* 26 U.S.C. § 108 (1988). This Court finds that Bailey knowingly and intentionally understated Layne's 1987 tax liability by improperly reporting a net operating loss carryforward on his tax return.

When Layne turned to Bailey after the IRS contacted him to ask why he had not paid self-employment taxes with his 1987 return, Bailey amended Layne's return. This time, Bailey caused it to report a deduction for cost of goods sold totalling exactly $52,500—precisely offsetting the income reported. Result: no new taxes. Layne testified that he did not incur any costs of goods sold, tell Clem Bailey that he had incurred such costs, or present Bailey with any documentation of expenses totalling $52,500. Accordingly, this Court finds that Clem Bailey knowingly and intention-ally understated Wendell Layne's 1987 tax liability by reporting a false deduction for cost of goods sold on his amended 1987 return.

### 10. MIKE PARKS and MARY I. LEE

Mike Parks has been self-employed in a number of ventures over the past several years, including Carriage Cars, Inc., M-Par, Inc., and a partnership involving M-Par, Inc. and Mary I. Lee, Joint Venture. None of these entities have ever filed income tax returns. Parks has used Clem Bailey & Associates for approximately seventeen years and has, on a monthly basis, delivered his personal and business books and records to Bailey's office. Bailey prepared Parks's 1985 federal income tax return which is the last return for Parks on file with the IRS. Parks claims he has not filed any returns since that date because Bailey lost his records.

Bailey also prepared federal income tax returns for Mary I. Lee, Parks's mother, from 1986 through 1990. On Lee's returns, Bailey reported a large loss for three consecutive years on the partnership between M-Par, Inc. and Mary I. Lee, Joint Venture. Neither Lee nor Bailey has been able to provide documentation establishing that she is entitled to any losses on the partnership. This Court finds that Bailey knowingly and intentionally understated Mary I. Lee's 1986, 1987, 1988, 1989, and 1990 tax liabilities by including unsubstantiated losses on her returns for each of those years. Also, Bailey knowingly and intentionally understated Mike Parks's tax liabilities from 1986 through 1990 by failing to prepare individual tax returns for Parks in those years, despite having received sufficient information from him to prepare them.

Bailey did, however, prepare returns for Parks in 1984 and 1985. In fact, he prepared two returns for each year: one to submit to a financial institution in support of loan applications and another for the IRS. Those filed with the "financial institutions" report significantly higher income than the returns prepared for submission to the IRS. This Court finds that Clem

Bailey knowingly and intentionally prepared false 1984 and 1985 federal income tax returns for Parks to submit to a financial institution.

## 11. EDDIE and MARY RICHARDSON

Clem Bailey prepared federal income tax returns for Eddie and Mary Richardson for over twenty years. During an audit of the Richardsons' 1987 and 1988 returns, the IRS discovered unfiled, handwritten returns for those years, signed by Bailey, which had been submitted to a bank and which reported substantially greater income than the returns Bailey prepared for filing with the IRS. Mary Richardson testified that Bailey prepared the handwritten returns for the bank to help the Richardsons obtain a loan, and that she instructed him as to her desired "bottom line" income figure. Bailey testified that he knew she wanted to submit falsified returns to obtain a loan, but that he prepared the returns as a special favor to her since she had been his client for over twenty years. He further testified, however, that he regrets his conduct and that he has never falsified returns for any other client. This Court believes otherwise. Clem Bailey's preparation of two materially different returns for the same taxpayer for the same year demonstrates his disregard—indeed, his contempt—for the proper administration of the internal revenue laws of the United States. A a result, this Court finds that Clem Bailey knowingly and intentionally prepared false 1987 and 1988 federal income tax returns for submission to a financial institution.

## 12. JOE and ELNOR ROGERS

Joe and Elnor Rogers used CBA to prepare their federal income tax returns from the early 1960s through 1984 and Joseph Schmitt to prepare their returns for 1985 through 1987. In 1986, the Rogerses purchased a commercial building in Hurst, Texas for $186,222. On their 1986 return, Schmitt used that year's property tax appraisal ($61,230 for the land, $56,122 for the improvements) to allocate the purchase price proportionately between the land

($97,232) and the depreciable improvements ($88,990).

In 1988, the Rogerses again asked Clem Bailey to prepare their income tax return. Bailey also prepared amended 1986 and 1987 returns, on which he valued the land at $25,222 and the depreciable improvements at $161,000. He claims to have based those values on an appraisal by Duane McDonald. The Rogerses deny paying for an appraisal by McDonald and profess not to know how Bailey arrived at his values for their property. Bailey did not produce at trial either McDonald or his alleged appraisal to substantiate his changes in those values. It is telling that when they refinanced the property in October 1989, the land appraised at $52,500 and the improvements at $69,500. The Court finds that Clem Bailey knowingly and intentionally understated the Rogerses' 1986 and 1987 tax liabilities by inflating depreciation deductions on their returns for those years.

## 13. TIMOTHY RUDOLPH and GLEN ROSE TITLE COMPANY

Timothy Rudolph is a lawyer in Glen Rose, Texas, as well as president and a fifty percent shareholder of Glen Rose Title Company ("Glen Rose"). Clem Bailey prepared Rudolph's federal income tax returns from approximately 1981 through 1988. Bailey also prepared corporate returns for Glen Rose from 1984 through 1988. Rudolph testified that he customarily used Bailey after Bailey had prepared an amended return for him which resulted in a substantial refund.

In 1984, Rudolph borrowed $30,000 to set up Glen Rose. He deposited the money in his lawfirm account and wrote checks out of that account for the company's expenses. The 1986, 1987, and 1988 returns for Glen Rose reflect a depreciation deduction against the $30,000 initial expenditure.

When the IRS examined the returns for Glen Rose, the examining agent, in the presence of Bailey, requested Rudolph to produce a copy of his 1984 individual return in order to determine whether Rudolph had also listed the $30,000 expendi-

ture as an expense deduction on that return. Bailey promised to provide it. After considerable delay, Bailey mailed Rudolph a Schedule C worksheet from the 1984 individual return and a letter dated January 27, 1990, in which Bailey stated, "it is plain the $30,000 was not deducted by you in 1984 nor was it deducted by the corporation." The worksheet Bailey provided did not reflect a $30,000 title company expense, but did show an additional $10,000 in repairs, an additional $10,000 in depreciation, and an additional $10,000 in court costs. Rudolph produced this document to the IRS examining agent.

In the interim, because of the delay in securing a copy of the 1984 individual return from Rudolph, the examiner obtained the original return filed with the IRS. It reflected a deduction of $30,000 on Line 30b of Schedule C labeled "abstract exp." Bailey does not deny the authenticity of the certified copy of the 1984 individual return, nor does he dispute that a double deduction appears on Rudolph's tax returns. Rather, Bailey argues that Rudolph altered the Schedule C Bailey prepared to show a $30,000 deduction for "abstract exp." and to omit the $30,000 in deductions for repairs, court costs, and depreciation. Tim Rudolph denies altering that Schedule C. This Court finds that Clem Bailey knowingly and intentionally understated the 1986, 1987, and 1988 tax liabilities of Glen Rose by including fraudulent depreciation deductions on the corporate returns for those years. This Court further finds that Bailey prepared a false document for presentation to the IRS on behalf of Tim Rudolph.

### 14.  BOB and ELIZABETH SAMUEL

Bob and Elizabeth Samuel own and operate an automotive repair business. The Samuels also receive installment sale income from various rental properties they have sold over the years. Clem Bailey prepared the Samuels' individual and corporate income tax returns from the early 1950s until 1989. Each year, Elizabeth Samuel gave summary sheets to Bailey to use in preparing the returns. The summary sheets list the expenses for the Samuels' automotive alignment business, rental property information, personal expenses, and the principal and interest received annually on their installment sales. Schedule B of the Samuels' 1987, 1988, and 1989 individual returns Bailey prepared all reflect income from interest payments on installment sales of property, but none show income from principal payments. Therefore, when the IRS examined the Samuels' returns for those years it determined that they owed an additional $17,465 in taxes.

Additionally, the 1987 Schedule C for the automotive alignment business includes $30,000 for wages to spouse. Although Elizabeth Samuel assisted her husband regularly in the business, she never received a salary, and the summary sheet she provided Bailey does not show that she did. By failing to report all the income received by the Samuels during 1987 through 1989, and by entering false deductions for wages, Clem Bailey willfully understated their federal income taxes for those years.

The Samuels employ two sons and an unrelated person in their automotive repair business. In 1973, Bailey advised the Samuels to treat their employees as contract laborers and discontinue filing W–2 forms for them. The Samuels never issued a Form 1099 to their contract labor employees because Bailey advised them it was unnecessary. This Court finds that the Samuels improperly treated their workers as independent contractors or contract laborers since the workers were, in fact, employees who eared hourly wages. This Court finds that Bailey knowingly and intentionally caused an understatement of the Samuels' employment tax liabilities by advising the Samuels not to file employment tax returns from 1973 through 1989.

### 15.  RONNIE SANDERS

Ronnie Sanders owns R & R Motors, Inc., a used-automobile business. On Sanders's 1987 and 1988 personal returns, Bailey failed to report the $50,000 Sanders earned in salary from R & R Motors. Although Sanders took Bailey's advice to place the words "advance" or "loan" on the checks he drew from the corporation, he

did not repay this money, and did not believe that he was obligated to do so. When Bailey prepared a 1987 return for Sanders to submit to the North Fort Worth Bank for purposes of obtaining a loan, however, it did include the $50,000 in salary. Bailey also prepared a 1987 corporate return for Sanders to submit to the bank which shows the corporation's taxable income to be $110,000 more than that shown on the 1987 return prepared by Kristi Shelton for submission to the IRS. This Court finds that Clem Bailey understated Ronnie Sanders's 1987 and 1988 income tax liability by intentionally leaving salary income off his tax returns for those years. This Court further finds that Bailey knowingly prepared false 1987 returns for Sanders and R & R Motors to submit to North Fort Worth Bank.

### 16. JERRY SCOTT

Dr. Jerry Scott is a dentist in Fort Worth. Dr. Scott initially hired Clem Bailey to prepare his 1986 income tax return, as well as his monthly books and employment tax returns. Scott also gave Bailey the Form K–1 that he received from a limited partnership, Camelback Southwest, Ltd. That form stated that Scott's share of a partnership gain, $233,380, should be reported on Form 4797 and attached to Scott's 1986 individual return.[6] Bailey reported this gain.

Bailey, however, also entered the identical sum as the basis of the property on Form 4797, thereby giving Scott a net gain of zero. That basis does not appear on the K–1 Scott gave Bailey, nor did Scott give Bailey any facts which would support a basis of $233,380. In fact, Scott told Bailey the basis was incorrect after Scott's financial advisor in Houston notified him that the return had been erroneously prepared. Bailey told Scott that the problem had been resolved, and that the return should be filed. It follows that Clem Bailey intentionally understated Scott's tax liability by placing a false basis on his 1986 return.

Bailey promised Scott that he would assist him during an IRS audit triggered by the false entry. After Bailey missed several audit appointments, he told Scott that he had hired an attorney, Bruce Hart, to represent him in the audit and subsequent tax court proceedings. When Hart did not attend the audit, Scott telephoned Hart who stated that he had never heard of Scott and that Bailey had not hired him. Bailey later explained to Scott that he had fired Hart.

Bailey next told Scott that he had hired Jack Price to represent him at a meeting with the IRS district counsel. Price did not attend this meeting and never contacted Scott. Although Bailey assured Scott that an attorney would represent him at the upcoming tax court trial, Scott appeared alone the day his tax court case was scheduled for trial. When the court permitted him additional time to retain another attorney, Bailey informed Scott that Gary Kleinschmidt would represent him. Although Bailey previously promised Scott that he would pay for the services of an attorney, Scott had to pay Kleinschmidt a retainer of $5,000 to represent him in March 1991. Clem Bailey thus prolonged the settlement of Scott's case before the tax court by promising to obtain legal representation for Scott at no extra fee, and then reneging on those promises. He also caused Scott to incur additional interest expense and unexpected attorney's fees.

### 17. JOSEPH SUTTON

Joseph Sutton took early retirement from the Santa Fe Railroad in 1988 in exchange for a lump-sum payment of $50,000. Sutton hired Clem Bailey to prepare his 1988 income tax return on the recommendation of other retired railroad workers. He told Bailey why the railroad paid him this sum, and he did not tell Bailey the

---

**6.** The tax treatment of a partnership item is determined at the partnership level. *See* 26 U.S.C. § 6221 (1982). Thus, a partner's individual return should be consistent with the partnership return in all respects including the amount, timing, and characterization of the item. If a partner does not conform his individual return to the partnership return, the IRS may conform the return and assess additional taxes resulting from any recomputation made necessary. *See* 26 U.S.C. § 6222 (1986 & Supp.1989).

money was from a retirement plan. Nevertheless, Bailey treated the $50,000 lump-sum payment as a distribution from a qualified retirement plan and averaged the income over a ten-year period.

The IRS disallowed the ten-year averaging and instead treated the lump-sum payment as taxable severance pay in the year received. *See* 26 U.S.C. § 61 (1984). Thereafter, Sutton paid Bailey $60 to file a tax court petition on his behalf to challenge the IRS's disallowance of the treatment of his severance pay. Bailey never filed the petition, and never refunded the $60. When the IRS began sending collection letters to Sutton, Bailey told him to ignore the "form letters." Ultimately, the IRS required Sutton to recognize the entire $50,000 payment as 1988 income. This Court finds that Clem Bailey knowingly and intentionally understated Sutton's federal income tax liability by treating his severance pay as nontaxable retirement pay on his 1988 return.

### 18. WADE and MARY TURNER and MY FAIR LADY

Wade and Mary Turner hired Clem Bailey to prepare their federal income tax returns beginning in 1982 or 1983. In 1986, Turner and Mary Meier formed a partnership, My Fair Lady, a women's retail clothing store. My Fair Lady also used Bailey's services. Bailey's office prepared My Fair Lady's monthly financial statements, as well as the Form 1065 partnership return.

My Fair Lady hired an in-house bookkeeper to write out the checks and place a record of the expenses on the stubs. On a monthly basis, My Fair Lady sent Bailey the sales tickets, daily cash balance sheets, bank statements, deposit slips, and cancelled checks. Turner either mailed or personally carried the ending inventory figures to Bailey's office. CBA prepared and mailed to My Fair Lady the monthly financial statements, which My Fair Lady promptly submitted to the bank and to the various merchandise vendors.

Although My Fair Lady provided Bailey with accurate inventory figures, the partnership returns for 1987, 1988, and 1989 are inaccurate. On the 1987 partnership return, Bailey erroneously decreased the ending inventory by $91,894, which increased the cost of goods sold and thereby inflated the partnership's deductions. On the 1988 partnership return, Bailey used a different, and lower, beginning inventory than the 1987 ending inventory. On the 1989 partnership return, Bailey again used a lower beginning inventory than the 1988 ending inventory. Moreover, the financial statements prepared by Bailey for submission to the bank where My Fair Lady did business do not match the partnership returns prepared by him for submission to the IRS.

Bailey also wrongly told the Turners that they could deduct up to $3000 a year for their daughter's clothing expenses if she wore clothes from My Fair Lady on the campus of Baylor University, where she was a full-time student. The daughter did not report the $3000 as income on her own return.

When Bailey failed to appear at the IRS audit of their returns, My Fair Lady's partners hired a certified public accountant, Harry Harelik, who recalculated inventory, purchases, and expenses based on the same books and records. Harelik testified that the records kept by the Turners and used by Bailey did not substantiate the figures on the partnership return and that the IRS properly disallowed the deduction for in-kind payments to the Turners' daughter. He agreed with the IRS that the individual partners owed over $80,000 each in taxes for 1987 through 1989. This Court finds that Clem Bailey knowingly and intentionally understated the 1987, 1988, and 1989 tax liabilities of Meier and the Turners by improperly reducing the income of My Fair Lady and by deducting in-kind payments to the Turners' daughter.

## B. JEWELENE BAILEY

### 1. ARLIN ELLIS

Arlin Ellis, an employee of General Dynamics, also runs a small farm which he purchased in 1985. At the time of purchase, the farm had a two-bedroom house,

an outbuilding, an all-metal hay barn, two windmills, two wells, and was fenced. Jewelene Bailey prepared the Ellises' 1988 federal income tax return. Form 4562, relating to the Ellises' farm income for 1988, reflects depreciation deductions of $8,868.78. Jewelene Bailey also prepared the depreciation schedule provided to the IRS during the examination of the Ellises' return. It includes a storage barn in addition to the hay barn and indicates that a storage barn had been part of the original purchase in 1985.

Ellis, however, testified that he never had a second barn on the property and had never told anyone at CBA that he owned two barns. The IRS disallowed the $1,301.05 depreciation deductions attributable to the storage barn in 1988 and 1989. Jewelene Bailey admitted she made an error on the Ellises' return, but claimed that the error was not intentional. This Court, however, finds that Jewelene Bailey knowingly and intentionally understated the Ellises' 1988 tax liability by including a false depreciation deduction for a second barn on their 1988 return.

### 2. JERRY KINDER

Jerry Kinder is a hairdresser who employed Jewelene Bailey to prepare his 1987 federal income tax return. For the preparation of that return, Kinder showed Bailey two cancelled checks he had written—one dated in 1985 and the other dated in 1986. Kinder told her they were for business expenses, and asked if she could include those amounts on his 1987 return. Bailey responded that she could, and she did, deduct them as business expenses, despite the fact they had been paid in previous years.

Bailey testified that she properly deducted the expenses in 1987 because Kinder borrowed money to pay the expenses and had only paid off the loan in 1987. Repayment of a loan, however, is not a deductible

expense. *Vukasovich, Inc. v. Commissioner of Internal Revenue*, 790 F.2d 1409, 1413 (9th Cir.1986); *Dowd v. Commissioner*, 68 T.C. 294 (1977). For a cash-basis taxpayer like Kinder, expenditures are deductible only in the year they are incurred. Jewelene Bailey undoubtedly knew this. She must, therefore, be found to have intentionally understated Jerry Kinder's 1987 tax liability by including false business deductions on his return for that year.

### C. KRISTI SHELTON

#### 1. CARL EDWARDS

Carl Edwards is a service manager for Southwest Ford, a car dealership. In 1987, Edwards received a salary, plus a $250-per-month "demo allowance" to cover the costs of his business travel.[7] Southwest Ford did not require Edwards to keep a log or record of his business mileage in order to receive the demo allowance, and he did not keep any such record.

Edwards paid Kristi Shelton to prepare his 1987 federal income tax return. Although Shelton interviewed Edwards and prepared a handwritten copy of the return, a typist actually signed Shelton's name to it. Edwards and his wife gave Shelton their W–2 forms, various receipts, and a Form 1099 for the value of the demo allowance from Southwest Ford, which had failed to withhold tax for that amount. Shelton asked Edwards how many miles he drove that year, how far he lived from work, and the number of days he worked. Edwards told Shelton that "he had no idea [how many miles he had driven that year]—ten to fifteen thousand," and that his homework-home trip was approximately ten miles.

The Form 2106 attached to Edwards's 1987 return showed a total of 7500 business miles out of a total of 10,000 miles driven.[8] The form also represents that Ed-

---

**7.** Although an employee is not required to treat as income reimbursement of business expenses he receives, monies received as reimbursement are taxable if the employee is not required to substantiate the expenses intended to be covered

by the arrangement. *See* 26 U.S.C. §§ 62(a)(2)(A), (c) (1988 & Supp.1991).

**8.** Form 2106, titled "Employee Business Expenses," is filed with Form 1040. In 1987, a taxpayer could deduct unreimbursed employee business expenses from adjusted gross income.

wards can provide written verification to document these figures. Edwards testified that he did not drive 7500 business miles in 1987, and does not know how Shelton arrived at that figure. Edwards's best estimate is that he drove a maximum of 4000 business miles in 1987.

Shelton testified that she reconstructed Edwards's business use of his vehicle the best she could with the information Edwards had available. In Edwards's case, if one adopts his estimate of a ten-mile daily commute and multiplies that figure by 250 days a year (fifty five-day weeks), it is clear that Shelton simply assumed that *all* vehicle use was "business" except for the 2500 miles generated by the daily commute. Her presumption is not reasonable, for it rests on the silly assumption that Edwards never used his vehicle for any purpose other than daily commuting and business. Accordingly, this Court must conclude that Kristi Shelton knowingly and intentionally understated Edwards' 1987 tax liability by including a false deduction for employee business expenses on his return.

## 2. ROGER and LISA MOORE

Roger Moore is an account manager who designs and sells software packages. In 1989, the company employing Moore sold itself another company for an exchange of stock. Each employee who, like Moore, owned stock in the selling company received stock in the buying company, which generated a taxable gain in 1989. Moore received an internal memorandum from his company in early 1990 informing him how to report the income he received from the stock sale. The memorandum stated that Moore would have both ordinary income and a short-term capital gain. According to the memorandum, the amount of the ordinary income Moore received from the stock sale was reflected in the W–2 he received for 1989. The memorandum also stated that Moore would have to report a capital gain on Schedule D. The memorandum clearly stated, in three separate

places, that the amount of Moore's Schedule D gain would "depend on *the ACTUAL NET PROCEEDS FROM THE SALE OF YOUR STOCK.*" Directly below the term "Net Schedule D gain" on the memorandum were the words "(EXAMPLE ONLY)."

Roger Moore hired Kristi Shelton to prepare his 1989 federal income tax return. He gave Shelton his W–2 forms, expense figures, earnings figures, and the internal memorandum to aid her in preparing his 1989 return. Despite the clarity of this memorandum, Shelton never asked Moore how much he received per share or in the aggregate for his stock. On Schedule D of the 1989 return, Shelton reported Moore's net gain as the example amount of $380 demonstrated in the memorandum, rather than the actual amount received by Moore which was much more than $380. The IRS subsequently determined that Moore owed a deficiency for the stock sale. Although Moore professed ignorance of the proper preparation of income tax returns and claimed not to know how to treat the stock sale correctly, he testified that Shelton made a good-faith error in computing his tax liability. This Court is not so naive. Kristi Shelton knowingly and intentionally understated Moore's 1989 tax liability by reporting only a portion of the income Moore actually received from the sale of his stock on his 1989 return.

## D. KATHY ZEEB

### 1. JACKIE EUSTICE

Sometime prior to 1988, Jackie Eustice purchased sixteen acres of swampland for $10,000. The sales contract did not allocate the $10,000 purchase price among the sixteen acres in the tract. In 1988, Eustice sold a small parcel of approximately five and one-half acres out of the sixteen-acre tract for $17,300.

Kathy Zeeb prepared Eustice's 1988 federal income tax return and reported the

---

*See* 26 U.S.C. § 162 (1986 & Supp.1991). A taxpayer now deducts these expenses as an itemized expense only to the extent they exceed 2%

of adjusted gross income. They are reported on Schedule A filed with Form 1040. *See* 26 U.S.C. § 67 (1986 & Supp.1991).

partial sale of the tract on his Form 4797.[9] Eustice told Zeeb what he paid for the entire sixteen-acre tract and the price for which he sold the small parcel. The Form 4797 prepared by Zeeb reflects that Eustice had a basis of $13,780 in the parcel he sold for $17,300. The tax return thus reflected a gain on the sale of only $3520.

The IRS adjusted downward the $13,780 basis shown on the return for the small parcel to reflect the fact that Eustice sold only a portion of the sixteen-acre tract and retained the remaining acreage.[10] The examining agent divided the $10,000 original purchase price by sixteen to arrive at Eustice's original price per acre. The agent then multiplied that figure by 5.5, the number of acres Eustice sold, to arrive at the permissible basis for the small parcel. Zeeb testified that since the remaining ten and one-half acres of land was worthless swampland, she properly apportioned the purchase price and basis between the smaller parcel and the remainder of the sixteen-acre tract. Kathy Zeeb offered no factual support for her assignment of a $13,780 basis to the smaller parcel. Therefore, the Court finds that Zeeb knowingly and intentionally understated Eustice's 1988 tax liability.

### 2. GEORGE KEMP

In 1989, George Kemp met with Kathy Zeeb for approximately one hour for the preparation of his 1988 federal income tax return. He gave her a list of interest and taxes paid, donations to his church, union dues and other job-related expenses, and a separate list of expenses related to his knife and buckle business, together with W-2 forms and a Form 1099 for the sale of land in Burleson, Texas.

Kemp and his wife purchased the land, intending to place a mobile home on it for use as their residence. Because the Kemps were unable to use the land for that purpose, they sold it at a loss to Mrs. Kemp's son, Richard Fuller, for $5,276.49. This amount is reported on Form 1099 of the Kemps' 1988 individual return. Fuller agreed to pay the Kemps an additional $4000 if he subsequently sold the property, but they have not yet received any additional money.

The Kemps never used the land for business purposes, nor did they tell Zeeb that they had. Even so, Zeeb reported its sale on Form 4797 of their 1988 return as the sale of business property and took a $6,723.51 ordinary loss.[11] Kathy Zeeb knowingly and intentionally understated the Kemps' 1988 tax liability by treating the sale of real property as an ordinary loss rather than a capital loss subject to capital loss limitations.

Even if the Kemps had used the land for business purposes, they could not properly claim a loss because they sold the property to Mrs. Kemp's natural son. The Internal Revenue Code specifically prohibits any deduction for a loss incurred in the sale or exchange of property between related per-

9. The gain is calculated by subtracting the taxpayer's basis from his sales price. *See* 26 U.S.C. § 1001 (1984). A taxpayer's basis in property is the cost of the property, plus the cost of any capital improvements, less any deductions for depreciation. *See* 26 U.S.C. § 1001-16 (1984 & Supp.1991).

10. Treasury Regulation 1.61-6(a) provides, in pertinent part:

   ... When a part of a larger property is sold, the cost or other basis of the entire property shall be equitably apportioned among the several parts, and the gain realized or loss sustained on the part of the entire property sold is the difference between the selling price and the cost or other basis allocated to such part. The sale of each part is treated as a separate transaction and gain or loss shall be comput-

ed separately on each part. The sale of each part is treated as a separate transaction and gain or loss shall be computed separately on each part. *Thus, gain or loss shall be determined at the time of sale of each part and not deferred until the entire property has been disposed of.*

Treas.Reg. 1.61-6(a) (emphasis added).

11. Ordinarily, the sale of capital assets results in a capital gain. When the sale of property used in a trade or business results in a loss, however, a taxpayer is permitted to treat the loss as an ordinary, rather than a capital, loss. *See* 26 U.S.C. § 1231 (1984). A taxpayer would naturally prefer to claim an ordinary loss, for which there is no limit, whereas a capital loss is limited to $3,000 per year, although the loss can be carried forward. *See* 26 U.S.C. §§ 1211(b), 1212(b) (1986 & Supp.1991).

sons. *See* 26 U.S.C. § 267(a) (1986 & Supp. 1991). Members of a family, including a person's lineal descendants, are considered "related" for purposes of the statute. *See id.* §§ 267(b)(1), (c)(4). This Court finds that Kathy Zeeb knowingly and intentionally failed to take account of the familial relationship between the buyer and seller which disentitled the Kemps to any loss on their 1988 return from the sale of their land in Burleson.

## 3. DON and BETTY RICHARDS

Don Richards owns R & R Concrete. His wife, Betty, assists him with the business and keeps the books. Prior to Kathy Zeeb's preparation of the Richardses' 1987 federal income tax return, Zeeb told Betty that she should be paid wages for maintaining the books and records of the family concrete business. Betty took Zeeb's advice and periodically wrote checks to herself as compensation for performing services for the company. These checks typically amounted to between $100 and $200. Betty never paid self-employment taxes on this income and never prepared a Form 1099 or a W–2 form for herself, even though she mailed a Form 1099 to all R & R Concrete employees.

On the Schedule C attached to the Richardses' 1987 return, Zeeb deducted $6500 for wages allegedly paid to Betty Richards. Line 20 of the return also reflects this amount as income. The records of R & R Concrete do not substantiate the $6500 deduction. During an IRS audit Betty could not reconstruct the salary deduction from her books and records. This Court also finds no factual substantiation for the deduction Zeeb placed on the return. Consequently, this Court finds that Kathy Zeeb knowingly and intentionally understated the Richardses' 1987 tax liability by including a fraudulent deduction for wages to Betty Richards on their return.

## E. RETURNS PREPARED JOINTLY BY MORE THAN ONE DEFENDANT

### 1. HELEN and JIMMY BARRETT

Jimmy Barrett is a self-employed drywall contractor. Helen, his wife, is a legal secretary who assists her husband in the drywall business. The Barretts paid $100 per month to CBA to perform bookkeeping services and to prepare monthly statements and federal income tax returns from the mid–1980s through 1988. Clem Bailey incorporated the Barretts' drywall business in 1985, maintained all the corporate paperwork associated with the business, and prepared the 1988 corporate return. Kathy Zeeb prepared the Barretts' 1985, 1986, and 1987 personal returns. On a monthly basis, the Barretts provided CBA with their bank statements, check stubs, and personal interest statements for the preparation of their personal tax returns.

In July 1988, the IRS notified the Barretts that their 1985 personal return had been selected for examination. The IRS scheduled a series of appointments with the Barretts, who in turn, notified Clem Bailey. Bailey told the Barretts to reschedule the first and second meetings and then advised them not to appear at the third rescheduled meeting because he had cancelled it. Bailey assured the Barretts that they would receive an IRS notice as to a fourth rescheduled meeting. Neither the Barretts nor Bailey ever met with the IRS to discuss the 1985 return.

When the Barretts received IRS notices that they owed taxes, penalty, and interest for the 1985 tax year, Bailey again reassured them not to worry and not to schedule future IRS meetings because he had transferred their case to "Problem Resolution," which he explained was a tax court.[12] The Barretts soon discovered, however, that their 1985 examination had been closed for their failure to appear within ninety days to contest the IRS's assessment. Several weeks later, Bailey told the Barretts that he could reopen their case.

---

**12.** The Problem Resolution Office is an ombudsman office to assist taxpayers with unusual or highly technical administrative or procedural problems. Problem Resolution is entirely un- related to the United States Tax Court, which provides a judicial forum for taxpayers to resolve their tax controversies with the Internal Revenue Service.

In December 1989, and again in February 1990, Helen Barrett unsuccessfully attempted to reopen their case in Problem Resolution. Shortly thereafter, Bailey represented to the Barretts that Problem Resolution would be sending them a letter stating that the dispute had been resolved and that the Barretts did not owe any money. The Barretts never received any such letter. Ultimately, the IRS issued a notice of levy against the Barretts for approximately $27,000, at which point Mrs. Barrett retrieved all her records from Bailey's office. This Court finds that the behavior of Clem Bailey and Kathy Zeeb in deliberately failing to appear at the examinations of the Barretts' 1985 return demonstrates a refusal to cooperate in the IRS examination process.

In June 1989, the IRS began examining the Barretts' 1986 personal return. Helen Barrett, Clem Bailey, and Kathy Zeeb were present for the first appointment with the IRS. The IRS examiner requested that the Barretts bring a number of documents to their next meeting, including a copy of the Barretts' corporate return. At the next meeting with the IRS, Clem Bailey presented to the IRS examiner two documents which he represented to be copies of the 1985 and 1986 corporate returns for the Barretts' drywall business. Helen Barrett, however, testified that neither she nor her husband ever signed a corporate return. This Court finds that Clem Bailey deliberately misled the examining agent by presenting to her copies of corporate returns that he falsely represented had been timely prepared, and by implication, timely filed with the IRS.

The Schedule C attached to the Barretts' 1986 personal return showed gross income of approximately $32,000 from wages that Jimmy Barrett caused his business to pay him in 1986. The IRS made an upward adjustment of $326,000 to the Barretts' income for 1986. This adjustment represented the gross income earned by the Barretts' drywall business in 1986 that had not been reported on any tax return.

Bailey alleges that "someone" in his office prepared the Barretts' corporate returns for the three subject years, and that the Barretts, for reasons unknown, did not sign and file the returns. This Court finds that Clem Bailey and Kathy Zeeb failed to prepare the 1985 and 1986 corporate income tax returns for the Barretts' drywall business—despite having the information necessary to do so and having been employed for that purpose. This Court further finds that Clem Bailey and Kathy Zeeb failed to prepare any returns—either corporate or individual—properly reflecting thousands of dollars in income actually earned by the Barretts' drywall business.

The IRS also disallowed a deduction of $13,500 for wages to Helen Barrett. Bailey advised Helen that the Barretts could attribute to Helen half of her husband's weekly wages of $500 so that they would not have to pay social security taxes on that portion.[13] Helen Barrett never told Clem Bailey that she worked for, or was paid by, her husband on a regular basis. Although she assists her husband by keeping the books, she is not, and never has been, paid for assisting her husband in his business. Further, Clem Bailey and Kathy Zeeb knew she was not paid for assisting her husband in his business because CBA kept monthly books for the Barretts' drywall business.

The IRS also disallowed a deduction of $3400 shown as "Cost of Goods Sold" for payment of wages to the Barretts' son, Kyle. Kyle did not receive a regular sala-

13. If a person is employed by another person or entity, the employer deducts social security or Federal Insurance Contribution Act ("FICA") taxes from the employee's wage. In addition, the employer pays an equal amount of "FICA" taxes on behalf of the employee. See 26 U.S.C. §§ 3101(a), 3102(a), 3111(a) (1988 & Supp. 1991). The IRS credits both the employee's portion and the employer's portion to the employee's social security earnings.

A self-employed person is responsible for paying his/her own self-employment taxes. See 26 U.S.C. § 1401(a) (1988 & Supp.1991). In effect, the self-employed person pays both the employer and employee portions of the tax. A person pays self-employment taxes only on *net* income from self-employment. Thus, any deductions effectively reduce the self-employment taxes. See 26 U.S.C. § 1402 (1988 & Supp.1991).

ry, nor did the Barretts tell Clem Bailey that they paid their son wages for assisting his father in the drywall business. The Barretts, however, did pay their son a regular weekly personal allowance. A business deduction is not allowed for personal, living, or family expenses. *See* 26 U.S.C. § 262(a) (1988 & Supp.1991). Clem Bailey and Kathy Zeeb testified that the Barretts split the $500 weekly draw from the drywall business between Helen and Kyle. Helen testified, however, that this $500 weekly payment was the entire sum the family drew from the corporation to pay their bills. Clem Bailey and Kathy Zeeb knowingly and intentionally understated the Barretts' personal tax liability by placing fraudulent deductions for wages to a spouse and child on Schedule C of their 1986 individual return.

## 2. JAMES and MARSHA BRANUM

James Branum is a self-employed framing contractor. Branum buys only a small amount of his own materials, usually nails, tools, and saw blades; the owner furnishes most of the rest. James and his wife, Marsha, employed CBA to prepare their 1987 and 1988 income tax returns. The Branums provided Clem Bailey and Kristi Shelton with a large sack containing all their business and financial records, including all the receipts and cancelled checks from James's business. Shelton interviewed Marsha and was primarily responsible for preparation of the returns, though Bailey signed the 1988 return.

On Schedule C of their 1988 return, Bailey or Shelton increased James's expenses for materials, shown as "costs of goods sold," by $19,000 over the actual costs, as evidenced by the Branums' receipts. The Branums never told Bailey or Shelton that James had additional costs. During the audit of their 1988 return, Shelton admitted making a mistake in the cost of goods sold, but she claims not to know how or why the mistake occurred. This Court finds that Clem Bailey and Kristi Shelton knowingly and intentionally understated the Branums' 1988 tax liability by overstating expenses of materials on Schedule C of their return.

## 3. DAVID and GLORIA CRISP

David Crisp has been self-employed in the utility construction business since 1979. Clem Bailey has prepared David and Gloria Crisps' federal income tax returns since about 1973, but Kristi Shelton assisted in the preparation of the Crisps' 1987 return. In 1987 and 1988, CBA also prepared monthly financial statements based on the Crisps' bank records. The monthly statements reflect that David Crisp spent $44,-537.63 for depreciable business equipment during 1987. Consequently, the 1987 return Bailey prepared for the Crisps shows a deduction for depreciation of equipment valued at that amount and placed in service that year. The return, however, also shows a business expense deduction for the same amount. Obviously, the Crisps were only entitled to a depreciation deduction.

Schedule C of the same return contains another double deduction. The return properly reflects a $26,000 deduction for wages to Gloria Crisp. It also shows a second deduction of $26,000 as "returns and allowances." The monthly statements prepared by Bailey's office do not substantiate a second deduction of $26,000, nor do they reflect any "returns and allowances." Bailey had no factual basis for claiming these deductions on the return.

Bailey claims that he mistakenly placed both double deductions on the Crisps' return, and that he did not catch these errors in his proofreading review, but this Court does not find his explanation credible. According to Bailey, he and Kristi Shelton miscommunicated when they worked together on the return. Moreover, they had used "drafts" of the monthly statements, instead of the final monthly statements, in order to save time in preparing the return. Even if they were true, these explanations would demonstrate an unacceptably high level of negligence. But it was not mere negligence. Clem Bailey and Kristi Shelton willfully understated David and Gloria Crisps' tax liability by twice including double deductions on their 1987 return.

The Crisps' 1988 return shows two $10,-000 deductions for "wages" paid to the

Crisps' two daughters. David Crisp testified that he paid his two daughters $10,000 each in 1988 for their college expenses. He determined the amount that he paid them at the end of the year and did not base the amount on the value of their services rendered. The Crisps relayed this information to Bailey. Even so, Bailey attempted to deceive the IRS by claiming these sums as deductible business wages. Clem Bailey knowingly and intentionally understated David and Gloria Crisps' federal tax liability by including fraudulent deductions for wages to their two daughters on their 1988 return.

### 4. WILLIAM DOBBINS

William Dobbins is a used-car dealer. CBA has prepared his federal income tax returns since about 1985. Kathy Zeeb prepared Dobbins's 1987 return but Clem Bailey prepared the 1988 return as well as monthly statements for Dobbins's used-car business. Dobbins operates his dealership as a sole proprietorship, so he reports the dealership's income and expenses on a Schedule C attached to his individual return.

The IRS examined Dobbins's 1987 and 1988 tax returns. CBA sent its bookkeeper, instead of Clem Bailey or Kathy Zeeb, to attend the audit and assist Dobbins in substantiating his returns. As to the 1987 return, the IRS disallowed wages of $30,-000 purportedly paid to Dobbins's wife. Although Mrs. Dobbins assisted her husband in the evenings with his business, she was employed elsewhere on a full-time basis during 1987. Kathy Zeeb and Clem Bailey knew that Mrs. Dobbins did not draw any wages from her husband's business because CBA prepared the monthly statements. Clem Bailey and Kathy Zeeb intentionally understated the Dobbinses' tax liability by including a fraudulent deduction for wages to Mrs. Dobbins on their 1987 return.

In 1988, the IRS required car dealers to use the accrual, rather than the installment, method of accounting. *See* 26 U.S.C. § 453(b)(2)(A). Under the accrual method, income and expenses are reported when

accrued, not when paid as in the cash accounting method. Bailey failed to make the necessary upward adjustments to the income reported on Dobbins's 1987 personal return. He also failed to report downpayments and trade-ins as income on the 1988 return. Moreover, Bailey deducted expenses incurred in March 1988, yet omitted March sales on that year's return. Bailey testified that he and Zeeb accurately reported the information furnished to them by Dobbins. Although Dobbins admitted that he had poor record-keeping, this Court does not accept the defendants' attempt to shift the blame of this understatement to Dobbins. The evidence is clear that Clem Bailey never asked for sufficient records from Dobbins in order to prepare the returns correctly. Such conduct can be attributed only to deliberate understatement, gross negligence, or ignorance. This Court finds that Clem Bailey knowingly and intentionally understated Dobbins's tax liability by failing to include all the income received from his used car business on his 1988 return.

### 5. DAVID and LINDA ELDERS

David and Linda Elders were in the dairy business until 1984. They initially hired CBA to prepare their 1986 federal income tax returns, at which time they had not prepared or filed their 1984 and 1985 returns. Bailey prepared the Elderses' 1986 return which reflected a net operating loss purportedly carried forward from their 1985 return. Kristi Shelton prepared the Elderses' 1987 and 1988 returns which also reflected this net operating loss carryforward from their 1985 return. Neither Clem Bailey, Kristi Shelton, nor the Elderses prepared a 1985 return prior to filing the 1987 returns.

The Elderses believed they had incurred losses during 1984 and 1985, and merely gave Bailey an estimate of those losses. Bailey told them that if the IRS ever questioned the loss on the 1986 return, he could amend the prior returns to account for the loss. The phantom net operating loss entered on the 1986 return, and the application of that net operating loss to the 1987

and 1988 returns, reflects Bailey's and Shelton's blatant disregard of the internal revenue laws. For a taxpayer to take a net operating loss carryforward, there *must* have existed a loss on a prior year's return.[14] If Bailey believed there was a factual basis for the loss, he should have informed the Elderses that he needed to prepare their delinquent 1985 return and determine the amount of a loss, if any. Bailey made no such attempt. Instead he created, without substantiation, a fictitious net operating loss.

When another income tax return preparer calculated the Elderses' 1984 and 1985 income tax liability in 1991, neither return he produced reflected a net operating loss. It's clear: Bailey knowingly and intentionally understated the Elderses' 1986 tax liability by including an unsubstantiated net operating loss deduction on their return. Almost as obvious is Kristi Shelton's knowing and intentional understatement of the Elderses' 1987 and 1988 tax liability by carrying forward the unsubstantiated net operating loss deduction on their returns for those years.

## 6. BILLY R. HUGHES

Billy Hughes inherited real and personal property from his mother in December 1988. During 1989 and 1990, Hughes sold at a loss the inherited real property and part of the personal property, including jewelry, silver, gold, and precious stones. Until he inherited the property, Hughes had always prepared his own federal income tax returns. He employed Clem Bailey and Kristi Shelton to prepare his 1989 and 1990 returns because he was uncertain about the tax treatment of gains or losses on inherited property.

Bailey and Shelton treated the sales as the sale of property used in a trade or business, and so reported an ordinary, rather than a capital, loss on Hughes's 1989 and 1990 returns. As a result, they substantially decreased Hughes's tax liability.

Hughes is a wage-earner. He has never been in the business of selling real estate or gold, silver, jewelry, or precious stones, nor did he ever tell Bailey or Shelton that he was in such a business. No other finding is possible but that Clem Bailey and Kristi Shelton knowingly and intentionally understated Hughes's tax liability by treating the personal property he sold as business property on his 1989 and 1990 returns.

## 7. KWEN KARR

Kwen Karr is a part-time farmer. When he hired CBA to prepare his 1988 federal income tax return, he brought to Clem Bailey's office a sheet of notebook paper containing a list of his 1988 income and expenses. Though he spoke with Kathy Zeeb, Bailey signed Karr's 1988 return.

Line 4 of Schedule F attached to Karr's 1988 return shows livestock sales of $1,481.55. Line 35a of Schedule F shows operating expenses of the same amount, so net farm income is zero. Karr did not tell Zeeb that he incurred any livestock expenses in 1988. In fact, Karr did not incur livestock expenses at all, because his father-in-law bore them.

Defendants attempt to shift the responsibility of falsifying this return to Marlene Carnley, a former employee of CBA. They maintain that Carnley actually prepared the return and wrongfully failed to sign her name as the return preparer. Carnley testified directly opposite: she assisted in the preparation of tax returns, but was explicitly instructed never to sign her name to any return. Carnley denies ever signing her name to a return during the course of her employment with CBA.

The Court believes Carnley. Clem Bailey and Kathy Zeeb knowingly and intentionally understated Karr's tax liability by reporting fraudulent deductions for farm operating expenses on his 1988 return.

14. Moreover, a net operating loss must be carried *back* before it is carried forward, unless the taxpayer makes a timely election to relinquish the carryback period. *See* 26 U.S.C. § 172(b)(3) (1988 & Supp.1991). Since the Elderses never made such an election—indeed, by the time they went to Clem Bailey & Associates it was already too late for them to make such an election— they were required to carry back any net operating loss prior to carrying it forward.

### 8. ED and MARY OLDSON

Ed and Mary Oldson are engaged in mobile home rentals and property sales. CBA began preparing the Oldsons' federal income tax returns in 1979. Clem and Jewelene Bailey prepared their 1987 and 1988 returns.

In 1980, the Oldsons sold a mobile home to the Carroways who made a $10,000 downpayment and gave the Oldsons a note for the remainder. In 1987, the mobile home burned and the Oldsons received $18,010 in mortgagee insurance proceeds. Although the Schedule B prepared by Jewelene Bailey and attached to the Oldsons' 1987 Form 1040 reported interest income for the Carroway property as well as for other properties, the Schedule D she prepared did not report the principal the Oldsons received in the form of insurance proceeds.[15] This Court finds undisputed evidence that the Oldsons told Jewelene Bailey about the $18,010 insurance payoff: her handwritten work copy of the 1987 Schedule D plainly shows the $18,010 figure written on the bottom margin of the page. Accordingly, this Court finds that Clem and Jewelene Bailey knowingly and intentionally understated the Oldsons' tax liability by failing to report principal income on their 1987 return.

### 9. CYNTHIA and ANDREW REASONS

Cynthia Reasons has worked as a dance instructor for Tarrant County Junior College ("TCJC") from 1987 to the present. During 1987 and 1988, she and her husband also taught dancing in the evenings at various nightclubs and were paid in cash about $60 a week in 1987 and $90 a week in 1988.

The Reasonses prepared a summary sheet listing all their expenses to assist Clem Bailey & Associates in preparing their federal income tax returns. Jewelene Bailey prepared their 1987 return; Kristi Shelton the 1988 return. Schedules C are attached to the Reasonses' 1987 and 1988 returns for their dance-instruction business. The schedules show mileage and other expenses related to dance instruction—but no income, since they indicate that such income is reported on attached W–2 forms. The dance instruction income is not reported on attached W–2 forms, however, nor is the cash income reported anywhere else on their returns.

Cynthia Reasons told the Baileys and Kristi Shelton that she and her husband were paid in cash for their nightclub work in 1987 and 1988, and she did not, as the defendants claim, tell anyone at CBA that TCJC paid for the nightclub gigs. Despite this, none of the Reasonses' cash income from the clubs was reported on either their 1987 or 1988 returns.

Clem and Jewelene Bailey intentionally understated the Reasonses' tax liability by failing to report their dance-instruction income on their 1987 return. Likewise, Kristi Shelton intentionally understated the Reasonses' tax liability by failing to report such income on their 1988 return.

### F. RETURNS PREPARED AFTER FEBRUARY 1992 COURT ORDER

#### 1. PAUL BOLTON

Paul Bolton is a self-employed construction contractor. He initially hired Tom Ward, a certified public accountant with over nineteen years' experience, to prepare his delinquent federal income tax returns for 1988 and 1989. Bolton gave Ward a grocery sack filled with bank statements, check stubs, and receipts. Bolton, however, did not file the returns Ward prepared. Instead, he hired Clem Bailey to recalculate his taxes because he had heard from other self-employed people that Bailey could save him some money. Bolton personally met with Bailey for the preparation of his return and produced the same grocery sack of documents he had given Tom Ward, along with the two unfiled returns Ward had prepared. After examining Ward's returns, Bailey told Bolton that he could "do better." Bolton filed the returns prepared by Clem Bailey on November 1, 1991.

---

**15.** In reporting installment sales of property, a taxpayer uses Schedule B to report interest income and Schedule D to report principal income. Thus, in most installment sales, a Schedule D entry will result in a corresponding Schedule B entry, and vice-versa.

Both versions of Bolton's 1988 return showed that he had gross income of $17,442 less a $100 expense deduction. The Ward return also showed additional deductions of $5157, with net business income being $12,185. Finally, Form 2119 attached to the Ward return reflects the basis on his home when he sold it as $35,500, resulting in a gain of $7989. The return prepared by Clem Bailey increased by $5400 the Ward deductions, thereby reducing Bolton's business income to only $6785. Form 2119 increased the basis of Bolton's home to $45,000, thereby resulting in a net gain of zero.

A comparison of the 1989 returns shows similar results. The Ward return shows net income of $19,978. The Bailey return shows net income of only $6298. On both the 1988 and 1989 returns, Clem Bailey deducted expenses without documentation and without Bolton's consent. For instance, Bolton testified that he bought his home for $35,500 and that he never told Bailey he paid $45,500 for the home.

The IRS has not audited Bolton's returns. Although Bailey testified that the returns he prepared are correct, he has refused to return any of Bolton's documents or records to him. This Court recognizes that some tax return preparers may interpret facts differently when adding up receipts and classifying deductions. Based on the credible testimony of Ward and Bolton, however, this Court finds that Clem Bailey knowingly and intentionally understated Paul Bolton's 1988 and 1989 tax liability by including fraudulent deductions on Bolton's returns.

### 2. MARY MARTIN

Mary Martin employed CBA to prepare her federal income tax returns from 1986 through 1990. On Form 4797 of Martin's 1986 return, Clem Bailey deducted $39,000 for a loss on the sale of oil and gas equipment. Martin never owned any oil and gas equipment; her only investment in an oil and gas interest was a $39,000 limited partnership in "NRM 1984-D Ltd."

On Schedule D of Martin's 1990 return, Jewelene Bailey deducted a loss of $39,000 for the sale of "Worthless NRM Stock." On her 1990 return, Jewelene Bailey also reported $1279 in *income* from the NRM limited partnership. Martin testified that she has never owned common stock in NRM and did not invest in oil field equipment, but that she did invest in a limited partnership under the name "NRM 1984-D Ltd."

Jewelene Bailey testified that Mary Martin told her to take a $39,000 deduction because the NRM stock was worthless. That a limited partnership could generate income and still be worthless is highly improbable. Jewelene Bailey admitted she never checked past returns to determine whether deductions had previously been taken. This Court finds that Jewelene Bailey knowingly and intentionally understated Mary Martin's 1990 tax liability by falsely reporting a worthless stock loss on her 1990 return and by twice deducting a single $39,000 investment.

### 3. JOSEPH and JOAN MULLEN

In 1988, Joseph and Joan Mullen purchased a 31,500 square-foot lot for $33,216. In 1990, they sold a right-of-way across the entire length of the property to permit construction of a petroleum pipeline and were paid $25,250: $12,500 for the right-of-way, $12,500 for damages, and $250 for an option to purchase.

Kristi Shelton prepared the Mullens' 1990 federal income tax return. When they informed her of the sale, Shelton, after consultation with Clem Bailey, assigned to the portion of the lot burdened by the right-of-way a basis of $25,250—about three-fourths of the price of the entire lot. She made no attempt to properly allocate the basis of the property between the burdened portion and the remainder. Further, Shelton erroneously told the Mullens that they did not have to recognize gain on the transaction until they sold the entire lot. This Court finds that Kristi Shelton knowingly and intentionally understated the Mullens' 1990 tax liability by assigning an inflated basis to the property they sold.

### 4. HENRY WEHRMANN

In 1989, Henry Wehrmann loaned $133,000 to Walls, an unrelated third party, who

secured the loan by the assignment of a surety bond. Walls defaulted on the entire loan, and Wehrmann sought to collect on his bond. When payment on the bond was refused, Wehrmann filed suit in Texas state court against the issuer of the bond and a bank. At tax time, Wehrmann told his tax preparer, Kathy Zeeb, of the pending lawsuit.

Zeeb attached Form 4797 to Wehrmann's 1990 federal tax return showing an ordinary loss of $133,000. Because Wehrmann is not in the business of making or brokering loans, however, he is not entitled an ordinary loss. Worse yet for him, he is not entitled to any loss at all in 1990—even a $3000 capital loss—because, legally speaking, he did not sustain a loss during 1990. When Wehrmann filed a lawsuit to recover his loss on the loan transaction, he created a reasonable inference that he has a claim for reimbursement. *Dawn v. Commissioner of Internal Revenue*, 675 F.2d 1077, 1078 (9th Cir.1982). The lawsuit was still pending when Zeeb completed Wehrmann's return. Even if the suit is ultimately unsuccessful, the assumption that Wehrmann had a valid claim for reimbursement in 1990 is not negated. *Id.* at 1078. Zeeb's complete failure to investigate fully the facts surrounding Wehrmann's lawsuit reveals her willful disregard of internal revenue rules and regulations. Upon learning of Wehrmann's suit, Zeeb should have questioned whether the loss was deductible. This Court finds that instead, Kathy Zeeb knowingly and intentionally understated Wehrmann's tax liability by including an unsubstantiated loss on his 1990 return.

## II. CONCLUSIONS OF LAW

### A. JURISDICTION AND AUTHORITY

This Court has jurisdiction over the subject matter of this case pursuant to 28 U.S.C. §§ 1340 and 1345. *See* 28 U.S.C. §§ 1340 and 1345 (1980). Congress expressly vested authority in this Court to enjoin persons from acting as income tax preparers in 26 U.S.C. §§ 7402(a) and 7407 of the Internal Revenue Code ("the Code").

### 1. *26 U.S.C. § 7402*

Title 26, section 7402(a) of the Code provides that the district courts of the United States shall have jurisdiction to issue orders of injunction and to render such judgments as may be necessary or appropriate to enforce the internal revenue laws.[16] The statute authorizes the fashioning of any appropriate remedy without enumerating the ways in which the revenue laws may be violated or their intent thwarted. As stated by the First Circuit in *Brody v. United States*, 243 F.2d 378, 384 (1st Cir.), *cert. denied*, 354 U.S. 923, 77 S.Ct. 1384, 1 L.Ed.2d 1438 (1957):

> It would be difficult to find language more clearly manifesting a congressional intention to provide the district courts with a full arsenal of powers to compel compliance with the Internal Revenue laws.

*See also United States v. First Nat'l City Bank*, 568 F.2d 853, 855–56 (2d Cir.1977) (noting "broad statutory mandate" and declining to construe restrictively).

Courts have relied on section 7402(a) in issuing a wide range of injunctions and other orders where necessary or appropriate to enforce the internal revenue laws. *See, e.g., United States v. Hart*, 701 F.2d 749, 750 (8th Cir.1983) (to enjoin an individual's harassment of Internal Revenue Service agents pursuant to section 7402(a)); *United States v. Landsberger*, 692 F.2d 501, 503–04 (8th Cir.1982) (to enjoin the promotion and sale of tax-evasion trust plans).

---

**16.** Title 26, section 7402(a) provides in pertinent part:

The district courts of the United States at the instance of the United States shall have such jurisdiction to make and issue in civil actions, writs and orders of injunction, ... and to render such judgments and decrees as may be necessary or appropriate for the enforcement of the internal revenue laws. The remedies hereby provided are in addition to and not exclusive of any and all other remedies of the United States in such courts or otherwise to enforce such laws.

26 U.S.C. § 7402(a) (1972).

### 2. *26 U.S.C. § 7407*

Title 26, section 7407 provides the court with injunctive remedies of increasing severity. If the court finds:

> that an income tax return preparer has ... engaged in any conduct subject to penalty under section 6694 ... or subject to any criminal penalty provided by this title, ... or ... engaged in any other fraudulent or deceptive conduct which substantially interferes with the proper administration of the Internal Revenue laws, and ... that injunctive relief is appropriate to prevent the recurrence of such conduct, the court may enjoin such person from further engaging in such conduct.

*See* 26 U.S.C. §§ 7407(b)(1)(A), (b)(1)(D), (b)(2) (1989). Section 7407(b)(2) further states that if the court finds that a return preparer has "continually or repeatedly" engaged in proscribed conduct and that an injunction prohibiting such conduct would not be sufficient to prevent such person's interference with the proper administration of the internal revenue laws, the court may *permanently* enjoin such person from acting as an income tax return preparer. *See* 26 U.S.C. § 7407(b)(2) (1989).

■ It is not necessary for the Court to address directly the common law requisites for injunctive relief since Congress, in legislatively granting injunctive powers, has already taken these requirements into account. *See United States v. Buttorff*, 563 F.Supp. 450, 454 (N.D.Texas 1983), *aff'd*, 761 F.2d 1056 (5th Cir.1985). In *Buttorff*, the court recognized that where, as here, an injunction is expressly authorized by statute, "the traditional equity guidelines for injunctive relief, both preliminary and permanent, may be somewhat modified." 761 F.2d at 1063.

Therefore, before deciding to issue a permanent injunction, this Court carefully reviewed the documentary and testimonial evidence adduced at both the preliminary injunction hearing and permanent injunction trial to determine whether the prereq-

uisites for the remedy have been demonstrated and whether an injunction would fulfill the legislative purpose of the statute. *See Buttorff*, 761 F.2d at 1059 (citing *Donovan v. Brown Equip. & Ser. Tools, Inc.*, 666 F.2d 148, 157 (5th Cir.1982) (upholding injunction pursuant to section 7408)); *United States v. White*, 769 F.2d 511, 514–15 (8th Cir.1985) (same); *United States v. Venie*, 691 F.Supp. 834 (M.D.Pa.1988) (enjoining tax return preparer under section 7407).

### B. CONDUCT SUBJECT TO PENALTY UNDER 26 U.S.C. § 6694

As originally enacted, title 26, section 6694 imposed penalties on tax return preparers who either 1) negligently or intentionally disregarded internal revenue rules and regulations, or 2) willfully attempted to understate the tax liability of another person. *See* 26 U.S.C. § 6694(a) (1976). Section 6694(a) has been amended for documents prepared after December 31, 1989. As amended, section 6694(b) continues to impose penalties on return preparers who either intentionally or recklessly disregard internal revenue rules and regulations, or who willfully attempt to understate the tax liability of another person. *See* 26 U.S.C. § 6694(b)(1), (b)(2) (1989). In addition, section 6694(a) now imposes a penalty upon a preparer who takes an unrealistic or frivolous position, of which the preparer knew or reasonably should have known, and fails adequately to disclose the position on the return.

Courts have interpreted the "negligent disregard" language of former section 6694 in a manner similar to the construction given to former section 6653, which imposed penalties on taxpayers for negligence. *See Brockhouse v. United States*, 749 F.2d 1248, 1252 n. 4 (7th Cir.1984); *Weidmann v. United States Dep't of Treasury*, 713 F.Supp. 569, 573 (W.D.N.Y.1989); *Swart v. United States*, 568 F.Supp. 763, 765 (C.D.Cal.1982), *aff'd*, 714 F.2d 154 (9th Cir.1983).[17] Negligence is statutorily de-

---

17. The legislative history of Code section 6694 also supports this interpretation. According to the report accompanying the legislation, section

6694(a) "is thus to be interpreted in a manner similar to the interpretation given the provision under [section 6653(a) ] relating to disregard of

fined as "includ[ing] any failure to make a reasonable attempt to comply with the provisions of [the Internal Revenue Code]." 26 U.S.C. § 6662(c) (1989); *see also* former 26 U.S.C. § 6653(a)(3) (1988). In addition, the federal courts have construed negligence to mean "lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances." *Brockhouse,* 749 F.2d at 1251; *Weidmann,* 713 F.Supp. at 573, *Swart,* 568 F.Supp. at 765. "[M]ere carelessness, however innocent, [also] constitutes negligence." *Swart,* 568 F.Supp. at 765.

■ The tax return preparer's failure to inquire into information provided by the taxpayer may also constitute negligence if the information supplied would lead a reasonable, prudent preparer to seek additional information. *See Brockhouse,* 749 F.2d at 1252. In *Brockhouse,* the taxpayer, a doctor, failed to inform the tax preparer that he received interest income from his professional corporation. The court held that the preparer, who prepared both the doctor's personal and corporate returns, who knew that the doctor had made loans to the corporation, and who knew that the corporation had made interest payments, negligently failed to inquire if the corporation paid some of the interest to the doctor. *See id. See also Goulding v. United States,* 2 T.C. 9498 (N.D.Ill.1989) (return preparer negligent under section 6694 for failure to make further inquiry of taxpayers); *Benson v. United States,* 1 T.C. 9424 (E.D.Cal.1985) (return preparer negligently and intentionally disregarded internal revenue rules and regulations by relying on information provided solely by promoters of family trust scheme).

■ A willful attempt to understate the tax liability of another person includes a "willful disregard of [internal revenue] rules and regulations." *Judisch v. United States,* 755 F.2d 823, 827 (11th Cir.1985). "[W]illfulness does not require fraudulent intent or an evil motive; it merely requires a conscious act or omission made in the knowledge that a duty is therefore not

being met." *Pickering v. United States,* 691 F.2d 853, 855 (8th Cir.1982). In *Pickering,* the Eighth Circuit found the return preparer had willfully understated his clients' tax liability by failing to report as income the payment of their personal expenses by their corporation. The court found willfulness because the return preparer had been put on notice that the corporation was paying those personal expenses, but failed to investigate further.

■ The documentary and testimonial evidence adduced at both the preliminary and permanent injunction hearings in this case fully demonstrate that the defendants have continually and repeatedly engaged in conduct subject to penalty under 26 U.S.C. § 6694 by willfully understating the tax liabilities of their clients and by consistently taking frivolous or unrealistic positions without adequately disclosing those positions on the relevant returns. Clem Bailey, Jewelene Bailey, Kristi Shelton, and Kathy Zeeb improperly reduced their clients' tax liabilities by, among others, failing to report taxable income, improperly inflating the basis of assets in order to increase depreciation and/or to decrease gain on sales, creating fictitious deductions, overstating legitimate deductions, deducting personal expenses as business expenses, deducting the same expense more than once, claiming fictitious wages to a relative as a business expense, and reporting taxable income as nontaxable income. Moreover, the defendants tailored these false or inflated deductions to each taxpayer's individual circumstances. The defendants cannot blame these "errors" on their clients, for they did not ask the defendants to enter these fictitious or padded deductions on their returns, nor did they provide the defendants with fraudulent documentation to support them.

## C. CONDUCT SUBJECT TO CRIMINAL PENALTY UNDER THE INTERNAL REVENUE CODE

Each of the defendants has engaged in some form of conduct subject to criminal

IRS rules and regulations by taxpayers on their own returns." H.R.Rep. No. 658, 94th Cong., 2d

Sess. 278 (1976), *reprinted in* 1976 U.S.C.C.A.N. 2897, 3174.

penalty under title 26, and thus is subject to injunction under section 7407.

### 1. *Violations of 26 U.S.C. § 7202*

■ Clem Bailey has violated 26 U.S.C. § 7202, by willfully failing to collect and pay employment withholding taxes due and owing to the United States.[18] He offers no excuse except that his failure resulted from the demands placed upon his time and money by the numerous IRS audits of his clients beginning in 1989. This argument is specious. Bailey's failure to pay taxes withheld from his employees' paychecks began almost a decade ago. That he continued paying wages to his employees, year after year, without paying any withholding taxes due to the United States, compels a finding that he willfully failed to pay such taxes and the conclusion that he has violated section 7202.

### 2. *Violation of 26 U.S.C. § 7203*

■ Clem and Jewelene Bailey have violated 26 U.S.C. § 7203 by willfully failing to file federal income tax returns from 1983 through 1990, inclusive.[19] The Baileys allege that they refused to file because their attorney told them that the IRS could use future tax returns as evidence against them in a pending criminal action for filing

false tax returns during 1981 and 1982. But the Baileys' reliance on an attorney's advice does not excuse their failure to file returns for eight years. The *only* situation in which a taxpayer may justifiably rely on the advice of his accountant or tax attorney not to file a return is when the taxpayer is advised that no return is due. *See United States v. Boyle*, 469 U.S. 241, 250, 105 S.Ct. 687, 692, 83 L.Ed.2d 622 (1985); *Denenburg v. United States*, 920 F.2d 301, 304 & n. 7 (5th Cir.1991) (citations omitted). Clem Bailey did not testify that his attorney advised him he had no duty to file a return. In fact, Clem Bailey admitted he knew he was required by law to file returns.[20]

### 3. *Violation of 26 U.S.C. § 7206(1)*

On December 17, 1991, a jury convicted Clem and Jewelene Bailey of two counts each of violating 26 U.S.C. § 7206(1) by willfully subscribing to false tax returns for the years 1981 and 1982.[21]

### 4. *Violations of 26 U.S.C. § 7206(2)*

■ Clem Bailey repeatedly engaged in conduct subject to criminal penalty under 26 U.S.C. § 7206(2) by willfully preparing false income tax returns for submission to financial institutions.[22] Marlene Carnley, a

---

**18.** 26 U.S.C. § 7202 provides that:

Any person required under this title to collect, account for, and pay over any tax imposed by this title who willfully fails to collect or truthfully account for and pay over such tax shall, in addition to the penalties provided by law, be guilty of a felony and, upon conviction thereof, shall be fined not more than $10,000 or imprisoned not more than 5 years, or both, together with costs of prosecution.
26 U.S.C. § 7202 (1954).

**19.** 26 U.S.C. § 7203 reads in pertinent part:

Any person required ... by this title or by regulations made under authority thereof to make a return ... who willfully fails to ... make such return ... at the time or times required by law or regulations, shall, in addition to other penalties provided by law, be guilty of a misdemeanor and, upon conviction thereof, shall be fined not more than $25,000 ... or imprisoned not more than 1 year, or both, together with the costs of prosecution....
26 U.S.C. § 7203 (1988).

**20.** There is, furthermore, no evidence that Clem Bailey fully disclosed to his attorney all the

facts and circumstances of his situation. It is not apparent from the record, for example, that Clem Bailey advised his attorney that he met the filing requirements for those years. Nor does the record reflect when his attorney gave this advice.

**21.** 26 U.S.C. § 7206(1) provides criminal penalties for any person who:

willfully makes and subscribes any return, statement, or other document, which contains or is verified by a written declaration that it is made under the penalties of perjury, and which he does not believe to be true and correct as to every material matter.
26 U.S.C. § 7206(1) (1982).

**22.** 26 U.S.C. § 7206(2) provides criminal penalties for any person who:

willfully aids or assists in, or procures, counsels, or advises the preparation or presentation under, or in connection with any matter arising under, the internal revenue laws, of a return, affidavit, claim, or other document, which is fraudulent or is false as to any material mater, whether or not such falsity or

former employee at CBA, testified that CBA regularly prepared returns for submission to financial institutions which differed from the returns prepared for submission to the IRS. She testified that the defendants kept these returns in a special file, labelled "M.L.," meaning mortgage loan returns. The Court notes that the defendants did not cross-examine Carnley on that point. This Court's conclusion that CBA regularly practiced this criminal activity is substantiated by Clem Bailey's admission that he prepared a fraudulent return for Mary Richardson to submit to a financial institution. Likewise, this Court finds that Clem Bailey violated 26 U.S.C. § 7206(2) by preparing tax returns for Mike Parks, Ronnie Sanders, and R & R Motors for submission to lenders which differed from the tax returns he prepared for them to submit to the IRS.

### 5. *Violations of 26 U.S.C. § 7206(2)*

■ Clem Bailey, Jewelene Bailey, Kathy Zeeb and Kristi Shelton also violated 26 U.S.C. § 7206(2) by willfully failing to sign their names to or review the returns they respectively prepared and by instead authorizing clerical personnel to sign their names on their behalf.[23] At least until January 1, 1991, the defendants customarily prepared the returns, submitted them to a typist, and never reviewed the typed returns before the taxpayers sent them to the IRS. According to the defendants, the typists were responsible for seeing that the return was mathematically correct. Such practice, which occurred on a very large per-

centage of the returns the defendants prepared, is not permitted by the Code.

■ Internal revenue regulations clearly mandate that an income tax preparer must manually sign the return he prepares in the space provided on the form. The regulations do not allow the return preparer to delegate this task to another individual. The *only* circumstance under which a person can sign his name to a return he did not prepare is if the signer reviews the entire preparation of the return and is satisfied that the return is prepared properly. The rationale for this regulation is elementary: the preparer whose signature appears at the bottom of the return is responsible for the contents of the return. A signature on a tax return is a written declaration made under penalty of perjury. *See* 26 U.S.C. § 6065 (1954). The signer must therefore review and sign the return to ensure and to vouch for its accuracy.

### 6. *Violations of 26 U.S.C. § 7207*

■ On numerous occasions, Clem Bailey presented false documents to the Internal Revenue Service on behalf of his clients. Such conduct directly violates 26 U.S.C. § 7207.[24] To review briefly the more egregious examples, he presented a false Schedule C to the IRS on behalf of Tim Rudolph in an attempt to convince the IRS that Rudolph was entitled to a depreciation deduction, when in fact he was not so entitled. On behalf of the Barretts he presented to the IRS copies of corporate returns which he falsely claimed had been timely prepared and filed. He also present-

fraud is with the knowledge or consent of the person authorized or required to present such return, affidavit, claim, or document.
26 U.S.C. § 7206(2) (1982).

**23.** Treasury Regulation § 1.6695–1(b)(1) provides in pertinent part:
An individual who is an income tax preparer with respect to a return of tax under subtitle A of the Internal Revenue Code of 1954 shall manually sign the return or claim for refund (which may be a photocopy) in the appropriate space provided on the return or claim for refund after it is completed and before it is presented to the taxpayer (or nontaxable entity) for signature. Except as provided in paragraph (b)(4)(iii) of this section, an individual preparer may not satisfy this requirement by

use of a facsimile signature stamp or signed gummed label. If the preparer is unavailable for signature, another preparer shall review the entire preparation of the return or claim for refund, and then shall manually sign the return or claim for refund.
Treas.Reg. § 1.6695–1(b) (1979).

**24.** 26 U.S.C. § 7207 provides in pertinent part:
[a]ny person who willfully delivers or discloses to the Secretary any list, return, account, statement, or other document, known by him to be fraudulent or to be false as to any material matter shall be fined not more than $10,000 ($50,000 in the case of a corporation), or imprisoned not more than 1 year, or both.
26 U.S.C. § 7207 (1987).

ed an altered document to the IRS on behalf of Joseph Bowles showing that Bowles was entitled to a greater depreciation deduction than was the case.

## D. CONDUCT WHICH SUBSTANTIALLY INTERFERES WITH THE PROPER ADMINISTRATION OF THE INTERNAL REVENUE LAW

█ In addition to causing understatement of their clients' tax liabilities, Clem Bailey, Jewelene Bailey, Kathy Zeeb, and Kristi Shelton deliberately engaged in obstructionist behavior in the course of appearing with taxpayers before representatives of the IRS. This behavior included postponement of appointments, appearing late or not at all, failing to respond to telephone calls and letters from the IRS, refusing to permit access to taxpayers' books and records, and refusing to engage in good faith conferences with IRS examiners and agents. The result of this unreasonable behavior has been unnecessary delay of proceedings at the IRS administrative level.

In *United States v. Music Masters Ltd.*, 621 F.Supp. 1046, 1057 (W.D.N.C.1985), the court found virtually identical conduct to be properly enjoinable under 26 U.S.C. § 7402(a) because the defendant's conduct interfered with the proper enforcement of the internal revenue laws by the IRS. *See also United States v. Savoie*, 594 F.Supp. 678, 683–85 (W.D.La.1984). Here, by hindering the determination, assessment, and collection of taxes owed by numerous taxpayers, Clem Bailey, Jewelene Bailey, Kristi Shelton, and Kathy Zeeb are interfering with the ability of the government to administer and enforce the internal revenue laws.

## E. INJUNCTIVE RELIEF UNDER SECTION 7407

█ Having found that Defendants continually and repeatedly violated section 6694, violated various criminal sections of the Internal Revenue Code, and repeatedly engaged in conduct which substantially interferes with the proper administration of the internal revenue laws, this Court now

turns to whether injunctive relief is appropriate to prevent recurrence of the defendants' conduct. In determining whether to grant a permanent injunction under sections 7407 and 7408 of the Code, the Fifth Circuit has approved the use of guiding factors such as those adopted in cases involving the issuance of injunctions to enforce the securities laws. *See United States v. Buttorff*, 761 F.2d 1056, 1059 (injunction under 26 U.S.C. §§ 7402(a), 7408); *United States v. Campbell*, 704 F.Supp. 715 (N.D.Tex.1988), *aff'd*, 897 F.2d 1317 (5th Cir.1990) (injunction under 26 U.S.C. § 7408).

In the securities law context, courts customarily assess the totality of the circumstances in deciding whether an injunction is appropriate. The factors to be examined include:

the gravity of harm caused by the offense; the extent of the defendant's participation and his degree of scienter; the isolated or recurrent nature of the infraction and the likelihood that the defendant's customary business activities might again involve him in such transactions; the defendant's recognition of his own culpability; and the sincerity of his assurances against future violations.

*S.E.C. v. Holschuh*, 694 F.2d 130, 144 (7th Cir.1982); *see also S.E.C. v. Blatt*, 583 F.2d 1325, 1334 n. 29 (5th Cir.1978). The Court will examine each of those factors in turn.

1. *The gravity of the harm.* Defendants repeatedly engaged in conduct prohibited by statute, all to the detriment of the United States Treasury and the taxpaying public. The large number of returns the defendants prepared over several years which understate their clients' tax liabilities demonstrates the gravity of the harm they caused.

Defendants are draining the administrative resources of the Internal Revenue Service by preparing returns that require examination. Although the government has been able to recoup some of the losses caused by the defendants over the years, much of the loss is unrecoverable. The government does not have the resources to examine every return the defendants pre-

pared. Of those returns which are examined, many taxpayers will not be able to pay their tax deficiencies in full. In some instances, the statute of limitations has expired.

Defendants' activities have also harmed their clients. A large number have been audited and subsequently required to pay back taxes and interest and, in some cases, penalties. Many of the defendants' clients have faced great difficulty reconstructing their financial affairs for tax purposes because the defendants have lost or misplaced their records. This conduct has resulted in severe financial hardships for those taxpayers and could have been avoided if the defendants had only prepared their returns honestly and accurately.

2. *Extent of the defendants' participation.* The defendants have continued this pattern and practice of understating their clients' tax liabilities for a number of years and show no sign of voluntarily ceasing it. An examination of the testimonial and documentary evidence reveals the intimate working relationship among Clem Bailey, Jewelene Bailey, Kristi Shelton and Kathy Zeeb. All four Defendants work closely together and assist one another in preparing income tax returns. In addition, Jewelene Bailey, Kristi Shelton, and Kathy Zeeb testified that they learned their income tax preparation procedures and techniques from Clem Bailey and continue to rely on him for advice and guidance. It is clear that, despite their protestations, defendants Kristi Shelton and Kathy Zeeb do not have tax-return businesses separate and apart from that of Clem and Jewelene Bailey.

3. *Defendants' degree of scienter.* The manner in which the defendants understate the tax liabilities of their clients is particularly significant: they cause understatements that will not be readily apparent. Typically, they have properly reported all income that should be reported on either a W–2 form or Form 1099, apparently because copies of those forms are sent to the IRS and thus can be cross-checked easily to ensure compliance. By contrast, the defendants have often omitted taxable income if the taxpayer received the income in cash, as in the case of the Reasonses and Earl Cromeans. Similarly, if taxable income could plausibly be attributed to another entity, such as the taxpayer's corporation, they simply did not file the corporate returns, as in the case of the Barretts and the Butlers. If the IRS subsequently examined the individual taxpayer, the defendants would attempt to "prove" to the IRS that the income not reported by the individual had been reported by the corporation by submitting copies of unfiled returns to the IRS examiners. Defendants have thus created a discernible pattern of nonreporting of taxable income which demonstrates their willful intent to understate their clients' tax liabilities.

Similarly, in fabricating and overstating deductions and losses, the defendants deliberately created fraudulent deductions that would be difficult to detect. For example, they frequently overstated depreciation deductions and, because depreciation schedules are not attached to returns, the IRS often overlooked them. Similarly, the defendants overstated meals, travel, and entertainment expenses, knowing that they could blame the taxpayers' poor record-keeping, or, if the IRS examined the return, fabricate the necessary records. They also claimed business-related payments to relatives, a difficult claim for the IRS to examine because all witnesses are interested parties.

The defendants argued repeatedly that the government has shown no motive for their deliberate understatement of their clients' tax liabilities. To the contrary, the defendants' motives are readily discernible. By building a reputation for drastically reducing tax liability or securing refunds when other tax preparers or even certified public accountants could not, the defendants built a large and prosperous tax-preparer business. CBA, despite the fact that it employed no college graduates, enrolled agents, or certified public accountants and depended only on word-of-mouth advertising, filed thousands of returns yearly all over the southwestern United States. The Court believes that this phenomenal volume of business was founded

818

on a well-deserved reputation, carefully cultivated by Clem Baily, that CBA could get income and deductions past the Internal Revenue Service when no one else could.

Many unsophisticated taxpayers were completely blameless in believing that CBA had legally secured for them favorable tax treatment. For many others, their greed overcame reason and good sense; they failed to be alert to tax advice that seemed, and was, too good to be true. While they would be loathe to admit it, what many of these taxpayers were purchasing from Clem Bailey's firm, often for a handsome fee, was a veneer of legitimacy for their, or the defendants', tax-evasion schemes, and, perhaps, a little salve for their consciences.

4. *Isolated or recurrent nature of infraction and likelihood of future ones.* Approximately eighty percent of the 521 returns prepared by the defendants and examined by the IRS as part of its Clem Bailey Return Preparer Project contained improper deductions and/or omitted income. The defendants routinely engaged in understating their clients' tax liability, and the understatements uncovered by the IRS are only a small fraction of the true extent of the harm. The Internal Revenue Service cannot, without judicial intervention, effectively stop the defendants from engaging in their unlawful behavior. The IRS can only act after a return has been filed and cannot devote the resources necessary to examine every return the defendants prepare.

5. *Defendants' recognition of culpability.* Defendants steadfastly deny that they have willfully understated their clients' tax liabilities. They have stoutly defended their activities and fail to concede even their obvious negligence. The defendants assert that, at worst, they made "mistakes." The Court wonders how, if these defendants truly made innocent mistakes in preparing tax returns for their clients, the mistakes are unvaryingly in the taxpayers' favor.

Clem Bailey routinely advises his clients not to file quarterly tax returns with the IRS if there is a chance that the company will not make a profit. He testified that he tells taxpayers they should use their money to maintain their businesses rather than paying the required taxes because "it's cheaper in the long run." Such advice indicates a blatant disregard of the Internal Revenue Code and clearly interferes with the proper administration of the internal revenue laws. Clem Bailey recognizes no culpability.

6. *Sincerity of assurances against future violations.* This Court believes that if the defendants are permitted to continue preparing tax returns, they will continue to engage in prohibited conduct. Any assurances the defendants could offer that they will not understate their clients' tax liabilities in the future would be worthless. Defendants amply demonstrated their defiance of the internal revenue laws when they prepared fraudulent returns after this Court ordered them, in February 1991, to "follow and abide by all rules and regulations of the Internal Revenue Service applicable to taxpayers," and enjoined them "not [to] interfere with and/or impede the proper administration of the Internal Revenue laws." Despite being so ordered and enjoined, the defendants knowingly and intentionally continued to prepare returns improperly, as shown by the 1990 returns of, *inter alia,* Roger Moore, Mary Martin, George Kemp, and Henry Wehrmann, and the refund claims for the Riddles, prepared in July of 1991. The defendants have dramatically demonstrated to the Court that nothing short of a full injunction will stop their unlawful conduct.

## III. ORDER OF PERMANENT INJUNCTION

Defendants' persistent conduct in preparing returns which claim illegal deductions and omit taxable income, as well as their obstructionist behavior in the course of representing taxpayers in Internal Revenue Service examinations, constitute interference with the internal revenue laws. Injunctive relief is appropriate and necessary to preclude such conduct.

Under the express terms of section 7402(a), this Court may issue a permanent injunction to ensure the proper enforce-

ment of the Internal Revenue Service rules and regulations. The case for injunction having been well-demonstrated by the government, this Court will broadly apply both sections 7402(a) and 7407.

Accordingly, it is hereby ORDERED that Clem Bailey, Jewelene Bailey, Kristi Shelton, and Kathy Zeeb, individually, and doing business as Clem Bailey & Associates, and all of their officers, agents, servants, employees, and attorneys, and persons in active concert or participation with them, directly or indirectly, by the use of any means or instrumentality, be, and they each are hereby, jointly and severally enjoined permanently from engaging in conduct subject to penalty under 26 U.S.C. § 6694, engaging in conduct subject to penalty under 26 U.S.C. § 6701, and engaging in conduct which substantially interferes with the proper administration of the internal revenue laws of the United States of America.

It is further ORDERED that Clem Bailey, Jewelene Bailey, Kristi Shelton, and Kathy Zeeb be, and they are, hereby permanently enjoined from acting as an "income tax return preparer" as that term is defined in 26 U.S.C. § 7701(a)(36) including, but not limited to: 1) taking any action in furtherance of aiding, assisting, advising, or preparing for compensation federal tax returns of third-party taxpayers; and 2) aiding or assisting in, or procuring or advising with respect to, the preparation or presentation of any portion of a return, affidavit, claim or other document for a third party in connection with any matter arising under the internal revenue laws.

It is further ORDERED that Kristi Shelton and Kathy Zeeb each may act as an income tax return preparer as that term is defined in 26 U.S.C. § 7701(a)(36) on or after January 1, 1995, provided that they, or each of them: 1) become and remain an active enrolled agent authorized by the Director of Practice of the Internal Revenue Service to practice before the Internal Revenue Service, and 2) refrain from soliciting or accepting any tax-related advice from, or consultation with, Clem Bailey or Jewelene Bailey and from sharing office space or clerical personnel with either of them or with each other.

The Court shall retain jurisdiction over this action for the purpose of implementing and enforcing the final judgment and all additional decrees and orders necessary and appropriate to the public interest.

SO ORDERED.